**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| JAMON RIVERA; CURTIS BANTA; YONKMAN CONSTRUCTION, INC.; PARAS HOMES, LLC; CONDRON HOMES, LLC; GARCO CONSTRUCTION, INC.; ARLINGTON 360, LLC; HUSEBY HOMES, LLC; SPOKANE HOME BUILDERS ASSOCIATION; WASHINGTON STATE ASSOCIATION OF UA PLUMBERS PIPEFITTERS AND HVAC-R SERVICE TECHNICIANS; UNITED ASSOCIATION OF PLUMBERS, PIPEFITTERS AND HVAC-R SERVICE TECHNICIANS - LOCAL 32; WASHINGTON AND NORTHERN IDAHO DISTRICT COUNCIL OF LABORERS; CITIZEN ACTION DEFENSE FUND; NATIONAL PROPANE GAS ASSOCIATION; AVISTA CORPORATION; CASCADE NATURAL GAS; NORTHWEST NATURAL GAS COMPANY,<br><br>*Plaintiffs - Appellants*,<br><br>v. | No. 25-2134<br><br>D.C. No. 2:24-cv-00677-KKE<br><br>OPINION |

VIKRAM SAMI, in his official capacity as Washington State Building Code Council Member; JAY ARNOLD, in his official capacity as Washington State Building Code Council Member; TODD BEYREUTHER, in his official capacity as Washington State Building Code Council Member; JASON BENWAY, in his official capacity as Washington State Building Code Council Member; TOM YOUNG, in his official capacity as Washington State Building Code Council Member; TOM HANDY, in his official capacity as Washington State Building Code Council Member; ANGELA HAUPT, in her official capacity as Washington State Building Code Council Member; ROGER HEERINGA, in his official capacity as Washington State Building Code Council Member; MATTHEW HEPNER, in his official capacity as Washington State Building Code Council Member; SCOTT BASTIANI, in his official capacity as Washington State Building Code Council Member; TYE MESNER, in his official capacity as Washington State Building Code

Council Member; BENJAMIN OMURA, in his official capacity as Washington State Building Code Council Member; MORGAN TWEED, in her official capacity as Washington State Building Code Council Member; KATY SHEEHAN, in her official capacity as Washington State Building Code Council Member; NICK BROWN, in his official capacity as Attorney General of Washington,

*Defendants - Appellees*,

CLIMATE SOLUTIONS; LANDS COUNCIL; SIERRA CLUB; PHYSICIANS FOR SOCIAL RESPONSIBILITY - WASHINGTON,

*Intervenor-Defendants - Appellees*.

Appeal from the United States District Court
for the Western District of Washington
Kymberly K. Evanson, District Judge, Presiding

Argued and Submitted February 10, 2026
Seattle, Washington

Filed September 9, 2026

Before: Richard A. Paez and Patrick J. Bumatay, Circuit

Judges, and Amy M. Baggio, District Judge.*

Opinion by Judge Paez;
Concurrence in the Judgment by Judge Bumatay

## SUMMARY**


### Sovereign Immunity

The panel affirmed the district court's dismissal, as barred by Eleventh Amendment sovereign immunity, of an action brought by a coalition of individuals, corporations, nonprofits, and unions, seeking declaratory and injunctive relief against enforcement of the Washington State Energy Code as preempted by federal law.

Under the Eleventh Amendment and the doctrine of sovereign immunity, a nonconsenting state is generally immune from suit in federal court. This sovereign immunity extends to suits against state officials when the state is the real, substantial party in interest, but it does not bar actions for prospective declaratory or injunctive relief against state officers in their official capacities for their alleged violations of federal law. Under *Ex parte Young*, in making a state officer a defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, the officer must have some


* The Honorable Amy M. Baggio, United States District Judge for the District of Oregon, sitting by designation.

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

connection with the enforcement of the act. The required "connection" demands merely that the implicated state official have a relevant role that goes beyond a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcement.

Plaintiffs named as defendants the individual members of the State Building Code Council who adopted the Energy Code, as well as the Washington Attorney General, in their official capacities. The panel held that defendants did not have a connection with enforcement of the Energy Code, and they therefore were shielded by sovereign immunity. The Councilmembers' promulgation of the Energy Code, without more, showed no connection with enforcement. Nor did their advice function, issuing non-binding opinions to guide cities and counties in the application of the Energy Code, demonstrate sufficient connection with enforcement. The panel distinguished *Mecinas v. Hobbs*, 30 F.4th 890 (9th Cir. 2022), which held that in a suit challenging a ballot ordering statute, the Arizona Secretary of State was not protected by sovereign immunity because her promulgation of an Election Procedures Manual directing counties to follow the challenged statute established the requisite connection with enforcement. The panel further held that, as to the Energy Code, the Washington Attorney General did not have a relevant role that went beyond a generalized duty to enforce state law.

Concurring in the judgment, Judge Bumatay wrote that the panel correctly held that *Mecinas* did not control this case. But *Mecinas* was wrongly decided because it cannot be squared with foundational principles of state sovereign immunity or its narrow exception under *Ex parte Young*.

## COUNSEL

J. Mark Little (argued) and Christopher E. Tutunjian, Baker Botts LLP, Houston, Texas; R. Scott Novak Jr., Baker Botts LLP, Washington, D.C.; Devon J. McCurdy and Callie A. Castillo, Ballard Spahr LLP, Seattle, Washington; Clifford S. Davidson, Amit D. Ranade, and Mallory L.B. Satre, Snell & Wilmer LLP, Seattle, Washington; for Plaintiffs-Appellants.

R. July Simpson (argued), Dierk J. Meierbachtol, and Sarah E. Smith-Levy, Assistant Attorneys General; Emma Grunberg and William D. McGinty, Deputy Solicitors General; Nicholas W. Brown, Washington Attorney General; Office of the Washington Attorney General, Olympia, Washington; for Defendants-Appellees.

Jan Hasselman, Earthjustice, Seattle, Washington, for Intervenor-Defendants-Appellees.

---

## OPINION

PAEZ, Circuit Judge:

Plaintiffs, a coalition of individuals, corporations, nonprofits, and labor unions, brought suit in district court seeking declaratory and injunctive relief against enforcement of the Washington State Energy Code ("Energy Code"). They argue that the Energy Code is preempted by federal law and allege that it restricts the installation and maintenance of natural gas appliances, interfering with their energy preferences and causing economic harm.

Plaintiffs named as defendants the individual members of the State Building Code Council ("Councilmembers") who adopted the Energy Code, as well as the Washington Attorney General, in their official capacities. The district court dismissed Plaintiffs' suit as barred by Eleventh Amendment sovereign immunity, and Plaintiffs timely appealed. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

Plaintiffs may overcome Washington's assertion of sovereign immunity only if they demonstrate that Defendants have "some connection with the enforcement" of the Energy Code. *Ex parte Young*, 209 U.S. 123, 157 (1908). We hold that they have not so demonstrated. The Councilmembers' promulgation of the Energy Code, without more, shows no connection with its "enforcement." *Id.* Nor does the Councilmembers' advice function—issuing non-binding opinions to guide cities and counties in the application of the Energy Code—demonstrate a sufficient connection with enforcement.

We further hold that, as to the Energy Code, the Washington Attorney General does not have a "relevant role that goes beyond 'a generalized duty to enforce state law.'" *Mecinas v. Hobbs*, 30 F.4th 890, 903–04 (9th Cir. 2022) (quoting *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004)).

All Defendants are thus shielded by sovereign immunity, and the district court properly dismissed Plaintiffs' suit.

## I. Background

### A. Statutes and Regulations

This case concerns two distinct categories of Washington laws, statutory and regulatory. The statute is

Washington's State Building Code Act ("the Act"). Wash. Rev. Code § 19.27.010. The Act provides for the adoption of a set of regulations known as the state building code ("Building Code"). *Id.* § 19.27.031. The purpose of the Building Code is to ensure that buildings throughout the State adhere to minimum standards of safety, accessibility, and efficiency. *Id.* § 19.27.020. The Building Code includes the Energy Code. *Id.* §§ 19.27.015(12)(b), 19.27A.020. Plaintiffs' complaint concerns the substance of the Energy Code, as adopted. Wash. Admin. Code § 51-11C-10000 *et seq.*; *id.* § 51-11R-10000 *et seq.*

Rather than adopt the substantive provisions of the Building Code directly in the Act, the Washington legislature established a State Building Code Council ("Council") and tasked it with adopting and amending the Building Code in three-year cycles. Wash. Rev. Code § 19.27.031(3)(a). The Council is housed within the Washington Department of Enterprise Services, a state executive branch agency. *Id.* §§ 19.27.070; 43.19.005(1).

The Council must adopt and amend the Building Code in accordance with the Washington Administrative Procedure Act ("APA"), chapter 34.05 of the Washington Revised Code. *Id.* § 19.27.032(6). Similar to the federal APA, the Washington APA provides for a system of legislative rulemaking by proposal, comment, and final adoption, with adopted rules carrying the force of state law. *Id.* §§ 34.05.001, 34.05.310–395. In line with the parties' briefing, we refer to the process of adopting and amending the Building Code pursuant to the Washington APA as "promulgation."

The Act requires cities and counties (collectively, "localities") to adopt and enforce the Building Code, with

some allowance for local variation. *Id.* §§ 19.27.031(1) (requiring local adoption of the Building Code), 19.27.050 ("The state building code . . . shall be enforced by the counties and cities."), 19.27.060(1) (providing for limited local amendment); *see also Taylor v. Stevens County*, 759 P.2d 447, 449 (Wash. 1988) ("The Act requires counties to adopt the enumerated codes, however, a county may amend the codes provided certain minimum performance standards and objectives are not diminished.").

Pursuant to local building ordinances consistent with the Act, localities process and review building permit applications for consistency with the Building Code. *See* Wash. Rev. Code § 35.22.280(24) (empowering first-class cities to regulate building construction and maintenance); *Taylor*, 759 P.2d at 450 ("[B]uilding codes, the issuance of building permits and building inspections are devices used to secure to local government the consistent compliance with zoning and other land use regulations and code provisions governing the design and structure of buildings.").

"The council may issue opinions relating to the codes at the request of a local official charged with the duty to enforce the enumerated codes." Wash. Rev. Code § 19.27.031(8). The parties agree that the Council's opinions are not binding on localities.

The Council adopted a new Energy Code—the only version at issue in this lawsuit—that went into effect on March 15, 2024.

### B. Procedural Background

The seventeen Plaintiffs are two individuals who prefer to use natural gas in their homes, six corporations that build homes and allege that they are incurring greater expenses to

install electric appliances, two trade associations, three labor unions, a nonprofit advocating for economic rights in Washington, and three public utilities.

Plaintiffs filed suit in the Western District of Washington seeking declaratory and injunctive relief against enforcement of the Energy Code. Plaintiffs named as Defendants fourteen Councilmembers in their official capacities, as well as the Attorney General of the State of Washington in his official capacity. Multiple nonprofits joined the action as defendant intervenors.

All Defendants moved to dismiss on sovereign immunity and standing grounds. The district court granted the motion to dismiss only on the basis of sovereign immunity, dismissing Plaintiffs' complaint without prejudice but denying leave to amend. Plaintiffs timely appealed.

## II. Standard of Review

We review de novo whether a state is immune from suit under the doctrine of sovereign immunity. *See Coal. to Def. Affirmative Action v. Brown*, 674 F.3d 1128, 1133 (9th Cir. 2012).

## III. Discussion

Under the Eleventh Amendment and the doctrine of sovereign immunity, a nonconsenting state is generally immune from suit in federal court. *Hans v. Louisiana*, 134 U.S. 1, 11, 16–17 (1890). This sovereign immunity extends to suits against state officials when "the state is the real, substantial party in interest."[1] *Ford Motor Co. v. Dep't of*

[1] The parties agree that Washington State is the real, substantial party in interest targeted by Plaintiffs' complaint, and Plaintiffs do not argue that Washington has consented to suit.

*Treasury*, 323 U.S. 459, 464 (1945). It "does not, however, bar actions for prospective declaratory or injunctive relief against state officers in their official capacities for their alleged violations of federal law." *Coal. to Def. Affirmative Action*, 674 F.3d at 1134.

"In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, . . . such officer must have some connection with the enforcement of the act . . . ." *Ex parte Young*, 209 U.S. at 157. This is a "modest" requirement. *Mecinas*, 30 F.4th at 904. "The 'connection' required under *Ex parte Young* demands merely that the implicated state official have a relevant role that goes beyond 'a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision.'" *Id.* at 903–04 (quoting *Wasden*, 376 F.3d at 919). We assess that connection "under state law." *Snoeck v. Brussa*, 153 F.3d 984, 986 (9th Cir. 1998).

Plaintiffs seek declaratory and injunctive relief against the Councilmembers and the Attorney General, named in their official capacities. The only question before us, then, is whether the Councilmembers and Attorney General have some connection with the enforcement of the Energy Code. We examine each of their connections with enforcement in turn.

## A. The Councilmembers

Plaintiffs advance two theories of how the Councilmembers are connected with the enforcement of the Energy Code. First, Plaintiffs point to the Councilmembers' promulgation of the Energy Code, in and of itself. Second, for further support, Plaintiffs point to the fact that the Councilmembers issue non-binding opinions to help local

officials interpret and apply the Energy Code. We hold that neither function provides the requisite connection with enforcement either on its own or in conjunction.

### 1. Promulgation

The parties dispute the following question: When a state official promulgates a regulation, does the act of promulgating the regulation, without more, connect the official to "enforcement" of that same regulation within the meaning of *Ex parte Young*? 209 U.S. at 157. We hold that it does not. None of our precedents so instruct. To the contrary, the principles underlying *Ex parte Young* dictate that promulgation and enforcement are distinct.

Before addressing Plaintiffs' arguments, we clarify the narrow question before us. The Washington legislature enacted the State Building Code Act, which in turn provides for the promulgation of the Energy Code by the Council. *See supra* Section I.A. The Act and the Energy Code are thus distinct. Separately, under *Ex parte Young*, the named defendant official must have some connection with the enforcement of the *challenged* law itself, not some other law. *See* 209 U.S. at 157 (distinguishing a prior case where the named defendants lacked "any special relation to the particular statute alleged to be unconstitutional" (quoting *Fitts v. McGhee*, 172 U.S. 516, 530 (1899)); *Snoeck*, 153 F.3d at 986 (requiring "a connection with the *challenged* state law" (emphasis added)). Here, Plaintiffs' complaint takes aim at the Energy Code as adopted, not the Act. So, for Plaintiffs to prevail, the Councilmembers' promulgation of the Energy Code must connect them to the enforcement *of the Energy Code* itself, not the Act.

Proceeding under this framework, Plaintiffs rely on three of our decisions to argue that the Councilmembers'

promulgation of the Energy Code connects them to its enforcement. We are not persuaded. In none of those cases did we hold that promulgation of a challenged act constitutes enforcement of that same act.

Plaintiffs principally rely on *Mecinas v. Hobbs*, claiming it is on "all fours" with this case and directs an outcome in their favor. In *Mecinas*, plaintiffs sued the Arizona Secretary of State to challenge a ballot ordering statute. 30 F.4th at 894–95. We found the requisite connection with enforcement for *Ex parte Young* purposes in *Mecinas* where the Secretary of State promulgated an Election Procedures Manual directing counties to follow the challenged statute. *Id.* at 903–04. Plaintiffs' suit was therefore not barred by Eleventh Amendment sovereign immunity. *Id.* at 904.

From *Mecinas*, Plaintiffs draw a simple, but incorrect, rule: "When a statewide official promulgates mandatory directives that local officials must carry out, the statewide official has the necessary connection to enforcement to trigger the *Ex parte Young* exception." Appellants' Opening Br. 22–23. Plaintiffs urge that because the Councilmembers promulgate the Energy Code, a mandatory directive, the Councilmembers must have the necessary "connection to enforcement."

The flaw in Plaintiffs' argument lies in a critical omission: "connection to enforcement" *of what?* Filling in the blank both removes the ambiguity and reveals that *Mecinas* is of no help to Plaintiffs. "When a statewide official promulgates mandatory directives [to comply with a statute] that local officials must carry out, the statewide official has the necessary connection to enforcement [of that statute] to trigger the *Ex parte Young* exception." In other words, an official who promulgates regulations may enforce

the *statute* authorizing those regulations. *Mecinas*, 30 F.4th at 903–04. But that does not mean the official necessarily enforces the *regulations*. That is, at no point in *Mecinas* did we hold that the Secretary "enforced" the Manual. Applied here, if Plaintiffs had challenged the Act, the Councilmembers' promulgation of the Energy Code might have demonstrated a sufficient connection with enforcement of the Act. But because Plaintiffs challenge the Energy Code, *Mecinas* is of no help to them.

Plaintiffs' other two cases miss the mark for the same reason—neither stands for the proposition that promulgation of a law connects an official to its enforcement. In *Coalition to Defend Affirmative Action*, plaintiffs sued the President of the University of California to challenge a provision of the California Constitution. 674 F.3d at 1131. We found a sufficient connection with enforcement in the President's role in ensuring that his employees followed the challenged provision. *Id.* at 1134–35. But the President clearly did not promulgate the provision. And in *Los Angeles County Bar Ass'n v. Eu*, 979 F.2d 697, 699 (9th Cir. 1992), plaintiffs sued California's Governor and Secretary of State to challenge a state statute providing for the appointment of superior court judges. We found a sufficient connection with enforcement in the Governor's appointment of judges and the Secretary's certification of judicial elections—not in the promulgation of the challenged statute. *Id.* at 704.

Plaintiffs have thus identified no precedent holding that an agency's promulgation of a regulatory law demonstrates a connection with enforcement of that same law. For good reason. The process of promulgating a regulation is distinct from its enforcement.

*Ex parte Young* itself confirms this distinction. The plaintiffs there sued to enjoin the enforcement of multiple Minnesota laws fixing passenger rail rates, including an act adopted by the Minnesota legislature and an order issued by Minnesota's railroad and warehouse commission. 209 U.S. at 127, 129–30. The Court held that Minnesota's Attorney General was an appropriate defendant in a federal court action to enjoin the enforcement of these laws. *Id.* at 161. It reasoned that "to enforce an unconstitutional act . . . is a proceeding without the authority of, and one which does not affect, the state in its sovereign or governmental capacity." *Id.* at 159. If enforcement, or "proceeding *under* [an] enactment," *id.* (emphasis added), is the point at which state officials lose sovereign immunity, that must mean that enforcement is an action distinct from prior acts, such as promulgation. Along those lines, the opinion consistently assumes that lawmaking and enforcement are distinct. *See, e.g.*, *id.* at 149 ("We have, therefore, upon this record, the case of an *unconstitutional act* of the state legislature *and* an intention by the attorney general of the state to endeavor *to enforce* its provisions . . . ." (emphasis added)); *id.* at 168 (concluding that a proceeding against the attorney general "to prevent his *enforcing* an unconstitutional *enactment* of a state legislature" is not a suit against the state (emphasis added)).

Plaintiffs, for their part, accept that the *Ex parte Young* exception does not expose state *legislators* to suit. But, in their view, that is because of where the legislators sit among the branches of state government. So, because the Councilmembers are part of Washington's executive branch, rather than its legislative branch, Plaintiffs argue that the Councilmembers are proper defendants.

We disagree. Immunity turns on an official's function, not her formal location in the branches of government. Absolute judicial immunity, for instance, flows "not from rank or title or 'location within the Government,' but from the nature of the responsibilities of the individual official." *Cleavinger v. Saxner*, 474 U.S. 193, 201 (1985) (citation omitted) (quoting *Butz v. Economou*, 438 U.S. 478, 511 (1978)). And judicial officials may exercise "delegated legislative power" and thus enjoy legislative immunity. *Sup. Ct. of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 734 (1980) (holding that the state supreme court and its members "are immune from suit when acting in their legislative capacity").[2] We have no reason to think that the *Ex parte Young* analysis is any more formalistic. *See Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 270 (1997) ("The real interests served by the Eleventh Amendment are not to be sacrificed to elementary mechanics of captions and pleading."). It is thus inconclusive that the Councilmembers are situated within Washington's executive branch. Their position in Washington's government, without more, does not mean that their every action constitutes enforcement within the meaning of *Ex parte Young*.

**2. Non-Binding Opinions**

While we hold that the Councilmembers' promulgation of the Energy Code does not provide the requisite connection with enforcement under *Ex parte Young*, that is not the end

[2] Defendants did not raise the defense of legislative immunity, but the doctrine may nonetheless inform our analysis. Under Plaintiffs' theory, state officials would lose *sovereign* immunity by virtue of the same legislative actions that would tend to entitle them to *legislative* immunity. *Cf. Consumers Union*, 446 U.S. at 734. We decline to invite that doctrinal conflict.

of our inquiry. An arm of the state can both promulgate and enforce regulations. *See, e.g.*, *Snoeck*, 153 F.3d at 987 (Nevada Supreme Court promulgated and enforced confidentiality rules). It thus remains to be decided whether the Councilmembers' other functions provide the requisite connection with enforcement.

Plaintiffs point to one other relevant function. On the request of local officials, the Council may issue opinions to help interpret what the Energy Code requires. Wash. Rev. Code § 19.27.031(8). The parties agree that these opinions do not bind local officials. Nonetheless, Plaintiffs argue that these opinions are "relevant" to the enforcement inquiry and "bolster[]" the independent sufficiency of the Councilmembers' promulgation function.

We hold that the Councilmembers' non-binding advice function does not demonstrate the requisite connection with enforcement. In other words, while one official or entity may both promulgate and enforce the same law, acting in different capacities or functions, the Councilmembers only promulgate, and have no connection with the enforcement of, the Energy Code. We base our conclusion on the non-binding nature of the Council's opinions and the Act's delegation of enforcement power to local officials.

Generally, non-binding advice to a third party tasked with enforcing a challenged law does not "establish sufficient connection with enforcement to satisfy *Ex parte Young*." *S. Pac. Transp. Co. v. Brown*, 651 F.2d 613, 615 (9th Cir. 1980). For example, in *Southern Pacific*, plaintiffs sued the Oregon Attorney General to challenge a criminal statute that prohibited employers from negotiating settlements for work-related injuries. *Id.* at 614. The Attorney General did not have the power to prosecute, but

was empowered by state law to "advise and direct the district attorneys in all criminal causes and matters relating to state affairs." *Id.* (quoting Or. Rev. Stat. § 180.060(4) (1980)). We held that the Attorney General's power to "direct and advise" did not suffice to make him an appropriate defendant because district attorneys could still prosecute violations of the statute even if the Attorney General advised them not to. *Id.* at 615.

*Mecinas*, and its discussion of *Mi Familia Vota v. Abbott*, 977 F.3d 461 (5th Cir. 2020), further illustrate that non-binding direction to third parties is generally insufficient. In *Mecinas*, the Arizona Secretary of State objected that she was not an appropriate defendant in a challenge to the ballot ordering statute because she did not print the ballots, but only issued a Manual to those who did. 30 F.4th at 903. The Secretary invoked the Fifth Circuit's decision in *Mi Familia Vota*. *Id.* Plaintiffs there sued the Texas Secretary of State to challenge, in pertinent part, a statute requiring counties to use electronic voting, rather than paper ballots, in order to offer countywide polling. *Mi Familia Vota*, 977 F.3d at 465, 468. Plaintiffs sought an injunction forcing counties that had opted into the countywide polling program to also provide paper ballots. *Id.* at 465. The Secretary's role was to prescribe rules for the adoption of non-paper devices and set fees for noncompliance. *Id.* at 465, 468. The Fifth Circuit held that this did not amount to enforcement of the paper ballot provision, because the Secretary had no power to require participating counties with electronic devices to also offer paper voting. *Id.* at 468.

In *Mecinas*, we concluded that *Mi Familia Vota* was distinguishable on the basis of the discretion vested in the Texas local officials to provide ballots and set methods of voting. 30 F.4th at 903. We emphasized that "an injunction

against the Texas Secretary of State would still leave local officials with enough discretion to prevent meaningful relief." *Id.* In contrast, the Arizona county officials in *Mecinas* had "no discretion to disregard" the directions in the Secretary of State's Manual on whether to follow the challenged statute. *Id.* That was because, among other things, Arizona law provided criminal penalties for violations of the Manual and characterized the Secretary's rules as mandatory. *Id.* at 900.

Whether state law expressly delegates enforcement power to a third party is also relevant to the enforcement inquiry.[3] In *Snoeck*, plaintiffs challenged Nevada's confidentiality rules for judicial disciplinary proceedings, naming as defendants the members of the Nevada Commission on Judicial Discipline. 153 F.3d at 984–85. The threat of enforcement motivating the plaintiffs' complaint was the threat of being held in contempt for violating the confidentiality rules. *Id.* at 987. But the Commission did not have the power of contempt; rather, the confidentiality rules expressly granted and confined that power to the Nevada Supreme Court. *Id.* In light of this express delegation of power to an entity other than the named defendants, we held that the Commission's role in advising the Supreme Court on the need for contempt did not amount to enforcement. *Id.*

[3] Regarding the concurrence, there is no need to address whether express delegation is necessary, and whether *Mecinas* correctly decided the issue, as the parties did not raise or brief that question. It may be difficult, however, to reconcile the concurrence's position with *Ex parte Young*'s full discussion of the necessity of an "express[]" delegation, whether in the challenged statute itself, 209 U.S. at 157 (quoting *Fitts*, 172 U.S. at 530), or the broader state statutory scheme, *see id.* at 161.

With these principles in mind, we hold that the Councilmembers' non-binding advice function, situated as it is alongside an express delegation of enforcement power to local officials, does not demonstrate the requisite connection with enforcement. Similar to *Mi Familia Vota*, and unlike *Mecinas*, an injunction against the Councilmembers' advice function cannot provide the relief that Plaintiffs seek. Even if the Councilmembers advised local officials that the Energy Code was preempted and should not be enforced, the statute would still empower and require local officials to enforce it. Wash. Rev. Code § 19.27.050. And it is the enforcement power of local governments to deny permit applications that motivates Plaintiffs' complaint, not the Council's power to give non-binding advice. Accordingly, as we did in *Snoeck*, we conclude that Plaintiffs have named the wrong defendants.

**B. The Attorney General**

We further hold that the Washington Attorney General is not sufficiently connected to the enforcement of the Energy Code. For the Attorney General to be a proper defendant, he must "have a relevant role that goes beyond 'a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision.'" *Mecinas*, 30 F.4th at 903–04 (quoting *Wasden*, 376 F.3d at 919). In other words, he need not have a significant role, but he must have a unique role relative to his role with other state laws.

The requirement of some unique connection is particularly relevant as applied to attorneys general. Absent such a requirement, "the constitutionality of every act passed by the legislature could be tested by a suit against . . . the attorney general, based upon the theory that . . . [they] might

represent the state in litigation involving the enforcement of its statutes." *Ex parte Young*, 209 U.S. at 157 (quoting *Fitts*, 172 U.S. at 530). Sovereign immunity forbids such expediency. *Id.*

Plaintiffs' theory of Attorney General enforcement is as follows: If localities decline to enforce the Building Code—presumably by granting permits for noncompliant applications—the Attorney General might step in to force local officials to resume their statutory enforcement duty. Plaintiffs emphasize that Washington would have no other means to compel local officials to enforce the Energy Code.

We are not persuaded. Plaintiffs have identified no statute, regulation, or case law suggesting that the Attorney General's duty in this regard "goes beyond" his generalized duty to enforce all state laws. *Mecinas*, 30 F.4th at 903–04. That Washington has not set up a unique enforcement mechanism for the off chance that localities decide to buck the Act is insufficient. The absence of a special scheme to ensure local cooperation with state law does not, by implication, define a "relevant role" for the Attorney General, where virtually all state laws are similarly lacking. *See id.* That is, Plaintiffs have identified nothing affirmative—either in Washington's laws or the Attorney General's actions—connecting the Attorney General to the Energy Code, but instead point only to a vacuum. The Attorney General is thus not a proper defendant.

## IV. Conclusion

Neither the Councilmembers nor the Attorney General are sufficiently connected with the enforcement of the Energy Code within the meaning of *Ex parte Young*. Because we hold that Plaintiffs' suit is barred by sovereign immunity, "we need not address the related issue of

standing." *Snoeck*, 153 F.3d at 988. The judgment of the district court is

**AFFIRMED.**

---

BUMATAY, Circuit Judge, concurring in the judgment:

A coalition of individuals, trade associations, companies, and unions challenge Washington State's Energy Code as preempted by the federal Energy Policy and Conservation Act. Under our precedent, they raise strong points. *See Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1098, 1107 (9th Cir. 2024). But to reach the merits of their claim, they must first sue the right defendants. State sovereign immunity dictates they have not done so. Rather than sue the municipalities that enforce the Energy Code, they instead sue state officials with little connection to the law's enforcement.

The coalition principally relies on *Mecinas v. Hobbs*, 30 F.4th 890 (9th Cir. 2022), to support its authority to sue these state officials under *Ex parte Young*, 209 U.S. 123 (1908). We correctly hold that *Mecinas* doesn't control this case. But even more fundamentally, *Mecinas* was wrongly decided. It simply cannot be squared with foundational principles of state sovereign immunity or its narrow exception under *Ex parte Young*. In the right case, we should consider overruling it.

## I.

## History of State Sovereign Immunity & *Ex Parte Young*

To understand why *Mecinas* was wrongly decided, a recap of first principles is helpful.

### A.

At common law, it was a bedrock premise that no court could exercise jurisdiction over the sovereign without the sovereign's consent. Going back to feudal times, neither manor lords nor monarchs could be sued in their own courts, because their courts could not compel them to appear as parties. *See* 1 F. Pollock & F. Maitland, History of English Law 518 (2d ed. 1899). After all, a suit against the king in his own courts would (absurdly) imply that the court's power was superior to his own. 1 William Blackstone, Commentaries on the Laws of England *234–35 (1765). And since courts could not compel the personal appearance of the sovereign monarch, any judgment against him was void for lack of jurisdiction. *See* Caleb Nelson, *Sovereign Immunity as a Doctrine of Personal Jurisdiction*, 115 Harv. L. Rev. 1559, 1568–74 (2002).

During the Founding Era, the States supplanted hereditary kings as sovereigns. A revolutionary idea had developed in the "Minds and Hearts of the People" that they in their collective capacity—rather than monarchs—were sovereign. Letter from John Adams to Hezekiah Niles (Feb. 13, 1818);[1] Akhil Reed Amar, *Of Sovereignty and Federalism*, 96 Yale L.J. 1425, 1434–35 (1987). The former colonies became "Free and Independent States," each

[1] https://founders.archives.gov/documents/Adams/99-02-02-6854. [https://perma.cc/2D3Q-3KBV]

asserting the collective sovereignty of the People: the "full Power to levy War, conclude Peace, contract Alliances, establish Commerce, and to do all other Acts and Things which Independent States may of right do." The Declaration of Independence para. 32 (U.S. 1776). And they formed a "new union of sovereign states," Bernard Bailyn, The Ideological Origins of the American Revolution 228 (1967), joined loosely together through a multinational compact that expressly preserved each State's "sovereignty, freedom and independence, and every Power, Jurisdiction and right" unless explicitly delegated to the national government, *see* Articles of Confederation of 1781, art. II.

In the debates over the Constitution's ratification, some Antifederalists feared that their States (and the local electorates that the States responded to) would no longer remain sovereign, given the Constitution's provisions for the supremacy of federal law and the existence of federal courts. *See*, *e.g.*, Brutus No. XIII, at 174 § 2.9.161 (Feb. 21, 1788), *in* The Anti-Federalist (Herbert J. Storing ed., 1981). But key Federalists such as Alexander Hamilton pledged that the States would not be forced into Article III courts. *See* The Federalist No. 81, at 486–87 (Alexander Hamilton) (Clinton Rossiter ed., Signet Classics 2003). Hamilton said that the States' exemption from suit was "one of the attributes of sovereignty" that was "enjoyed by the government of every State in the Union," and that nothing in the Constitution had displaced this preexisting immunity. *Id.* Meanwhile, at the Virginia ratifying convention, a young John Marshall dismissed as not "rational" the concern that the Constitution would make States suable by individuals. John Marshall, Convention of Virginia, *reprinted in* 3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 555 (Johnathan Elliot ed., 1st ed. 1836). At the

same convention, James Madison concluded that under the proposed Constitution, "[i]t is not in the power of individuals to call any State into Court." Debates of the Virginia Convention, June 20, 1788, *in* 10 The Documentary History of the Ratification of the Constitution 1414 (John P. Kaminski et al. eds., 1993).

Yet, just a few years later, the Supreme Court surprised many by holding the opposite. In *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 420 (1793), a citizen of South Carolina sued Georgia for satisfaction of a contract under the Supreme Court's original jurisdiction. The State refused to appear, claiming immunity from suit. *Id.* at 419. Four members of the Court held for the plaintiff, even while recognizing that the State would have enjoyed its claimed immunity had the Constitution not been enacted. *See id.* at 471, 479 (opinion of Jay, C.J.).

Alone in dissent, Justice Iredell argued that state sovereign immunity was a deeply rooted principle of the common law and remained in force post-ratification. *Id.* at 449 (opinion of Iredell, J.). Justice Iredell's views were vindicated after *Chisholm* by swift passage of the Eleventh Amendment and by the Court's eventual decision in *Hans v. Louisiana*, 134 U.S. 1, 15–16 (1890). There, the Court emphatically declared, "the cognizance of suits and actions unknown to the law, and forbidden by the law, was not contemplated by the [C]onstitution when establishing the judicial power of the United States. . . . The suability of a state, without its consent, was a thing unknown to the law." *Id*. Since then, even as some have questioned the textual and historical bases of the state sovereign immunity doctrine, *see, e.g.*, John F. Manning, *The Eleventh Amendment and the Reading of Precise Constitutional Texts*, 113 Yale L.J. 1663, 1728–33 (2004); Amar, 96 Yale L.J. at 1466–84, the Court

has continually reaffirmed the importance of state immunity from suit as part of our constitutional design, *see, e.g.*, *Principality of Monaco v. Mississippi,* 292 U.S. 313, 330 (1934); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 72 (1996); *Alden v. Maine*, 527 U.S. 706, 754 (1999); *Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 236 (2019).

**B.**

The Supreme Court created an important—yet narrow—exception to state sovereign immunity in *Ex parte Young*. *See* James E. Pfander & Jacob P. Wentzel, *The Common Law Origins of* Ex parte Young, 72 Stan. L. Rev. 1269, 1276–77 (2020) (tracing the roots of the *Ex parte Young* doctrine to the seventeenth-century writs of certiorari, mandamus, and prohibition). *But see generally* Andrew S. Oldham, Adam I. Steene & John W. Tienken, *The* Ex Parte Young *Cause of Action: A Riddle, Wrapped in a Mystery, Inside an Enigma*, 120 Nw. L. Rev. 1697 (2026) (questioning *Ex parte Young*'s consistency with the history of equity and the Supreme Court's cause-of-action jurisprudence). This exception applies only to "individuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state[] and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act [that would violate] the Federal Constitution[.]" *Ex parte Young*, 209 U.S. at 155–56. These individuals "may be enjoined by a Federal court of equity from such [unconstitutional] action." *Id.*

The Court held that such an exception was consistent with state sovereign immunity. *Id.* But this was only because an official attempting to enforce an unconstitutional law would no longer be deemed clothed with the State's

sovereignty, and an injunction would thus not "affect[] the state in its sovereign or governmental capacity." *Id*. at 159. Meanwhile, the Court announced a critical check: The officer must have a "special relation to the particular statute alleged to be unconstitutional." *Id.* at 157. Though the challenged statute need not specifically delegate enforcement authority to the officer being sued, that officer must nonetheless be "expressly directed [by state law] to see to its enforcement." *Id*.; *see also id.* at 161 (holding this requirement was satisfied because of the attorney general's common-law authority to prosecute suits to enforce state law, a statute making the attorney general the *ex officio* attorney for the state railroad commission, and a statute giving the attorney general power to sue corporations for violations of state law). Otherwise, the individual sued would merely be a "representative of the state," which impermissibly would "make the state a party." *Id.* at 157 (simplified).

Thus, in our circuit, we've made clear that the connection between the alleged unconstitutional act and the state official being sued must be "fairly direct." *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943 (9th Cir. 2013) (simplified). We've said in multiple cases that "a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit." *Id.* (simplified). For instance, in *Confederated Tribes & Bands of the Yakima Nation v. Locke*, 176 F.3d 467, 470 (9th Cir. 1999), we barred suit against a governor for allegedly violating the Indian Gaming Regulatory Act through creation of a state lottery when the relevant state law had no "indication that the governor ha[d] the responsibility of operating the state lottery or

determining where its tickets will be sold." And in *National Audubon Society, Inc. v. Davis*, 307 F.3d 835, 847 (9th Cir. 2002), we held that neither a State's governor nor the State's Secretary of Resources were amenable to suit when they had no enforcement responsibility for a state environmental protection statute, even though other (lower-ranked) state officers could be haled into court.

## II.

## ***Mecinas* Was Wrongly Decided**

*Mecinas* departed from these basic principles. In that case, three voters sued the Arizona Secretary of State to challenge the State's Ballot Order Statute. *Mecinas*, 30 F.4th at 894. The statute required that the names of gubernatorial candidates needed to appear on ballots in order of how many votes their parties had received in the prior election. Ariz. Rev. Stat. ("A.R.S.") § 16-502(E); *Mecinas*, 30 F.4th at 894–95. Under the law, county boards of supervisors were responsible for preparing and printing the ballots. A.R.S. § 16-503; *Mecinas*, 30 F.4th at 899–900. The Secretary of State was authorized to issue an Election Procedures Manual that county officials had to follow upon pain of misdemeanor. A.R.S. § 16-452(C); *Mecinas*, 30 F.4th at 900. The Manual included, among other rules, the Ballot Order Statute's requirement that candidates' names appear in the order of prior-election vote totals. *Mecinas*, 30 F.4th at 900.

We should have held that the Secretary was immune from suit. *Ex parte Young* required us to hold that a suable official be one that was "*expressly* directed to see to [the Ballot Order Statute's] enforcement." 209 U.S. at 157 (emphasis added). But "neither the challenged section of the Ballot Order Statute . . . nor the provision that directs the

board of supervisors in Arizona's counties to prepare and print ballots . . . [even] mention[ed] the Secretary." *Mecinas*, 30 F.4th at 899–900. Sure, the Secretary promulgated the Election Procedures Manual. *See* A.R.S. § 16-452(C). But that merely made the Secretary more like a legislator than an enforcer of the law. In contrast, county boards of supervisors had primary supervisory authority over election procedures, *see, e.g.*, *id.* §§ 16-404, 405, 411(A), 531(A), and the statute expressly tasked them with printing ballots, *id.* § 16-503. And no state law gave the Secretary power to prosecute violations of the Election Manual. Rather, the Arizona Attorney General had civil and criminal prosecutorial power to enforce the State's election code. *Id.* § 16-1021. In other words, there was no "special relationship" between the Secretary of State and the statute. So a lawsuit against the Secretary impermissibly "ma[de] the state a party." *Ex parte Young*, 209 U.S. at 157.

Our court wrongly held otherwise. In doing so, we made two clear errors:

First, *Mecinas* transformed *Ex parte Young* into a "modest" hurdle to be overcome with creative pleading. 30 F.4th at 904. *Mecinas* misunderstood our repeated admonitions not to allow suit against those with "a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision." *Id.* at 904–05 (quoting *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004)). Instead, it suggested that nearly anyone *except* those with a "generalized duty" or "general supervisory power" could be sued. *See id.*

While this sort of judicial rulemaking-by-negative-implication might be appropriate for construing a statute, it

was not how the court should have read *Ex parte Young* or our later precedents. *See Lexington Ins. Co. v. Smith*, 117 F.4th 1106, 1126 (9th Cir. 2024) (Bumatay, J., dissenting from the denial of rehearing en banc) (warning against interpreting cases like legislation). Such expansive reading disregards the structural dignity of States to avoid suits by individuals, forces federal courts to exercise jurisdiction over the governmental capacities of sovereign States, and threatens to swallow *Ex parte Young*'s intentionally narrow exception.

This reading also ignored *Ex parte Young*'s requirement that the officer sued must be "*expressly* directed to see to [the challenged law's] enforcement." 209 U.S. at 157 (emphasis added). In *Mecinas*, we acknowledged that the relevant statutes did not even "mention" the Secretary. 30 F.4th at 900. But we relied on the fact that the Secretary's Election Manual bound county officials. *Id.* at 903 (citing A.R.S. § 16-452(A), (C)). In doing so, we failed to consider that the Secretary of State could not enforce violations of the Election Manual. *See* A.R.S. § 16-1021. Nor did he have any other supervisory authority under state law over county officials; indeed, the Secretary of State was elected by and answerable to an electorate that was a *completely different jurisdiction* from those that elect the boards of supervisors expressly tasked with printing ballots. *Compare* Ariz. Const. art. V, § 1.B (statewide election of Secretary of State)*, with* A.R.S. § 11-211 (countywide election of boards of supervisors).

Second, *Mecinas* conflated the analyses required for Article III standing and the *Ex parte Young* exception. *See* 30 F.4th at 903–04. *Mecinas* assumed that if Article III traceability and redressability were satisfied, then *Ex parte Young*'s "connection" requirement was satisfied as well. *Id.*

at 903 (simplified). And in *Mecinas*, because the Secretary could issue rules that were binding on county officials and an injunction could stop the Secretary from issuing those rules, Article III was satisfied. *Id.* at 899–900. Necessarily then, *Ex parte Young* was satisfied as well. *Id.* at 903–04.

But that's wrong. *Mecinas* failed to recognize that even if Article III and *Ex parte Young*'s "connection" requirement share a "common denominator," that doesn't mean they're the same equation. *See id.* at 903 (simplified). Indeed, *Mecinas* should have considered multiple possibilities: (1) the plaintiffs had Article III standing against the Secretary of State but failed to show that *Ex parte Young* applied, (2) the plaintiffs did not have Article III standing against the Attorney General but showed *Ex parte Young* would have otherwise applied, or (3) the plaintiffs had Article III standing against the county officials and showed that *Ex parte Young* applied against them. But treating the Article III and *Ex parte Young* inquiries identically, as *Mecinas* did, disregards our constitutional system's unique concern for the state sovereignty. It also threatens to make *Ex parte Young*'s strict limits nearly meaningless so long as Article III is satisfied.

## III.

We correctly decline to follow *Mecinas* here. But *Mecinas* threatens great mischief. The Supreme Court has repeatedly emphasized the importance of upholding the dignity of the States. *See, e.g.*, *Monaco*, 292 U.S. at 330; *Seminole Tribe*, 517 U.S. at 72; *Alden*, 527 U.S. at 754; *Hyatt*, 587 U.S. at 236. As inferior courts, we are obligated to enforce the Court's commands by respecting *Ex parte Young*'s strict limits on suits against state officials. *Mecinas* failed to do so.

With these observations, I concur in the judgment of the court.